Our second case is Fain v. Crouch, and I will say that this is not original to me, but Judge Richardson suggested that I tell counsel that if you have anything new to add, we'd love to hear from you. And if you don't, I'll think carefully, Your Honor. Mr. Williams. Thank you very much. Good morning, Your Honors, and may it please the Court. West Virginia Medicaid faces a dire situation. The agency may see budget shortfalls of hundreds of millions of dollars in just the next few years. At the same time, Medicaid must meet the needs of the low-income population of the state with some of the worst health outcomes in the country. So the agency has to make hard choices. And here, the agency has applied a facially neutral classification in declining to pay for a particular set of surgical procedures for a particular diagnosis of gender dysphoria. Those specific surgical procedures are expensive, and insufficient medical evidence exists to show their efficacy. So rather than cover those surgeries, West Virginia Medicaid covers a variety of other treatment avenues for persons with gender dysphoria. Yet the district court thought that a distinction like this one, that is one based on a medical diagnosis, is necessarily the same as a classification expressly based on a protected trait like sex. That approach contravenes a long history of cases, stating that courts cannot assume discrimination from the mere fact that a facially neutral classification overlaps, even extensively, with a protected class. The district court's approach ignores Supreme Court precedent requiring evidence of animus before applying heightened scrutiny to a facially neutral classification. And it runs roughshod over substantial state interests that support the state's diagnosis-focused choices about care and coverage while in a region grappling with serious challenges. For this reason, the court should reverse. Now let me be clear about the threshold question. It was error for the district court to find that this regulation was a facially discriminatory act. Cases like Godoldig, Gilbert, Feeney, Bray, even Dobbs all emphasize that a statute is not assumed to have discriminatory intent merely because it targets an activity or group of people that exclusively or predominantly overlaps with a protected class. Let me ask you this on Godoldig. Did you maintain that case eliminated all proxy-based classification? No, Your Honor. What the case says is that if a statute does not expressly hinge on a protected classification, that you can look behind that in certain narrow circumstances. And in particular, what Bray says is that if there is literally, for instance, no justification whatsoever for the particular classification that is used, or in the words of Bray, if there is an irrational object of disfavor, then at that point one might fairly presume that in fact the proxy is basically a facial classification in disguise. So we're not suggesting that the statute has actually used the word woman or man in order to amount to sex discrimination. Let me ask you another defining question. Do you believe or challenge that only transgender individuals are ones who seek sex-affirming surgeries? That is correct, but I want to be very clear about what the record in our case shows in terms of the overlap between these populations. About 1 in 200 people are transgender. Then 1 in 1,000 people are in clinical care for gender dysphoria. And then a smaller population of even that set actually go on to seek surgical treatment for their gender dysphoria. So it would be a mistake to suggest that transgenderism and persons who are seeking surgical treatment for gender dysphoria, which in our situation is the only class that matters, are actually synonymous. That's not consistent. I think what's also important, Your Honor, is that cases like Bray and cases that preceded it, like Geduldig, said that even a close identity between those groups is not enough. You have to add that additional something, which is a total lack of rational explanation for the distinction that was drawn here based on that characteristic. I understand that your Geduldig argument shows that this isn't sex discrimination. But your Geduldig argument doesn't show that this isn't transgender status discrimination. So Geduldig really has two holdings. One is that pregnancy discrimination isn't sex discrimination. And second is that pregnancy discrimination isn't itself a suspect basis for categorization. How does the Geduldig argument get you that this is not discrimination based on transgender status? I understand the argument, how it gets you that this is discrimination based on sex. I think it gets us there, Your Honor, because what Geduldig does say is that a state is entitled to look to a medical diagnosis for the decisive material facts, even when that medical diagnosis has a close affiliation or a complete overlap with a protected class. So in your question, for instance, it may be that there is a complete overlap between the medical diagnosis of gender dysphoria and transgenderism, but what Geduldig tells us is that it's not enough. And then if you read through those chains of cases, if you read through Feeney, for instance, where Feeney says a veteran classification always affects men, at least at that time, and that the inevitable conclusion has to be that there is solely a distinction that is drawn on sex, that is simply not enough. But Feeney doesn't seem to help any more than Geduldig helps in the same way. To decide whether a person is pregnant, I don't have to decide what their sex assigned at birth is. To decide if a person who is a veteran in Massachusetts is a veteran, I don't have to decide if that person's sex assigned at birth was. Here I literally can't do – I can't apply this statute without knowing a person's sex assigned at birth, right? Respectfully, Your Honor, that's not the case in West Virginia. What happens in West Virginia is if you receive a diagnosis of gender dysphoria and you then seek surgical treatment to address that diagnosis, you would not be covered by our Medicaid plan. So the only question for purposes of our coverage is whether the diagnosis code that you are presenting the state plan with – My sense is that at least in terms of what the medical professional actually does, the intervention that a medical professional does, it involves incisions, it involves hormones, it involves all kinds of stuff, right? In order for me to decide whether the thing that's being done is transsexual surgery, I need to know that, right? Well, I do want to make one clarification because there was a statement about hormones. But what I'm talking about, when a physician is deciding, is the thing that I'm about to do to this person something that I'm allowed to do under this policy? Right. Right. So in terms of whether it would be transsexual surgery, the physician's judgment, their judgment, might have some, I guess, connection, relationship to natal sex. Fair enough. But the state's decision, the decision that actually is relevant here, doesn't actually have anything to do with that. Okay, let me ask you a different question. Sure. I understand you can make an argument about being used as a verb, being used as an adjective, but I guess, let me just say politely, I find that completely unpersuasive. How does this not have a Romer problem? Literally, the statute, the policy forbids transsexual surgery. What is transsexual surgery? Things that people identify as transgast, right? I mean, I understand that one can make very clever grammatical arguments, but that's not what it seems like it obviously is. But do you have any sort of real-world-based argument for why a prohibition on transsexual surgery is not a prohibition on the kind of surgery that transgender people get? Absolutely, Your Honor. One is that everyone below understood that that was describing a set of surgeries for people who were seeking treatment for the diagnosis of gender dysphoria. So in that way, that's a perfectly reasonable decision to deny coverage for a certain specific subset of procedures for a certain specific medical diagnosis. In the same way, for instance, that we might— Well, that's what the people who have to implement this policy have tried to implement this policy as. But that's not what the people who passed this policy said. What they said, what we want to ban is something that we're calling transsexual surgery. That sure sounds like an intent to target a specific population. Well, I think certainly this policy has existed for some time, so it derives, uses language that in the present day might sound different than the way that we would describe gender dysphoria today, for instance. And I think it's very likely, and I want to be clear about what the record does and does not show, the record does not show why the specific word transsexual was used. But what we do know is that CMS, for instance, particularly back in the 90s and particularly in the early 2000s, referred to these sorts of procedures as transsexual-related surgeries. So it seems very likely that the only reason why West Virginia described it with that particular word is because it was looking by reference to the CMS guidance and the CMS statements that used the same term. And that obviously doesn't reflect some kind of discriminatory intent. It actually reflects a deference to the federal judgments and the federal administrator of the same Medicaid program. So in that way, all we were doing was making a judgment that we didn't want to provide coverage for a specific procedure because generally, for instance, the West Virginia Medicaid plan does not provide surgical treatments for psychological conditions such as these. So to pick up on Judge Wynn's question from the earlier argument, do you think, for example, adultery would reach the same result even if the exclusion were framed as women's baby-related leave? Do you think that's still not facial discrimination based on sex? I think that... It would be re-characterized as women's baby-related leave. Yes, Your Honor, I think that would be what... That wouldn't be a facial classification based on sex. I think what the adultery suggests is that when the statute is defining the action by reference to the condition and not by reference to the sex of the individual with the condition, that you cannot assume that's a facially discriminatory classification. I'm not dismissing... Oh, go ahead, Your Honor. What if the condoling exclusion were more like no pregnancy-related care for an unmarried husky who got pregnant? Do you know what I mean? Certainly, Your Honor. I think that is the sort of evidence that the city of Arlington Heights, for instance, suggests could be... If it's still on its face, you would say that is sex-neutral. Okay. I think, Your Honor, what the cases say is that you make an initial determination about whether the statute is a facially discriminatory classification in that the decision is driven solely by the protected trait, in this case, sex. And if it is, then, yeah, we go ahead and we apply hearing and scrutiny. If it's not, the state's position is not that you stop and you say, great, we're all done. The state's position is only that you then have a responsibility to summon additional evidence. And that can come in all sorts of forms. It could be direct evidence of discrimination. It could be the sort of inference that Braves suggests in a rare case. All we're saying is that that evidence does not actually exist in this specific case. What we instead have here is we have language that does not present as a facially discriminatory classification. We have a record that does not contain direct evidence of animus of any form. And we do not have a situation like the one described in Braves when it's characterizing the tax on yarmulkes, where there is no rational explanation whatsoever for what the state did here. Because what the state did here can be rationally explained, both by the reality that these procedures are significantly expensive in a plan that is struggling to stay solvent year to year, and by the fact that these medical procedures remain procedures. Can I ask one follow-up question from the last argument? The suggestion was raised that the Supreme Court has suggested it's facial when it's based on conduct instead of class. And the examples I think was Lawrence and Obergefell. Can you talk for a minute about whether you think those cases are equal protection facial holdings or why you think those cases don't demand that this is a facial classification? Right. And the state recognizes, for instance, Judge Harris' analysis and William C. Kincaid, we're applying Christian legal society. We're saying that when you're focused on homosexual conduct, it's the same thing as attacking homosexual status. We're not contesting that sort of analysis. All we're saying is that's not the way that this particular regulation is written. It would be one thing if we said if a patient walks into a doctor's office and they present as a woman and they have a natal sex of male, there are a whole series of procedures that fall off the board. That is not what is happening here. What's actually happening here is that we are having patients of all natal sexes from all over the place walking into doctors' offices and saying we want a specific treatment for a particular condition. And the state has said we do not think that the medical evidence and the cost justifies providing that specific treatment for that condition. And so in that way, that choice does not actually change on gender. In no way related to conduct, in no way related to status. So CLS, Lawrence, any of those cases simply fall off the board. And that's why ultimately, even though GDULIG kind of unsettles some of us, I recognize that, but ultimately I think GDULIG does get it right in that sense. It looks for that first initial status. And then it's only once we make that first judgment that we then kind of move on to the next step of is there sufficient circumstantial evidence, is there actually direct evidence available. I want to make sure I understood what you said about Bray. I thought at one time you said that is a facial, if it's irrational, no other rational basis, that can be a facial determination. And then I may have misunderstood you a bit. But then later you kind of categorized the Bray analysis as something you did after, for a non-facial reason. So is Bray in the facial world or non-facial world? And I want to be clear. That was probably my own sort of mistake. Bray was talking, and specifically the discussion about the hypothetical tax on yarmulkes, for instance. Bray was talking about that, and I believe it characterized that, that would not be a facially discriminatory classification. But it then said the court would still have license to go beyond that and say, oh, this actually is a proxy for a facial discriminatory class because there is absolutely no explanation that can exist for imposing a tax on yarmulkes other than discriminatory intent. So if we use the statistics that you talked about earlier, about the certain number of people who are transgender and the certain number of people who have gender dysphoria that are transgender and the smaller number of people who have dysphoria that have surgery, if we view that as irrational to support your cost argument or inconsistent, we don't do that at the facial stage. We do it at a different stage. That's right. I think cost is only relevant at the, I guess it's sort of between the facial stage but before the rational basis stage. I guess it's sort of the analysis of whether we've sufficiently established discrimination by proxy or whether plaintiffs have sufficiently established discrimination by proxy. If the state's offering a cost justification that's just without any basis whatsoever in logic or fact, then I think maybe then the court could say, well, no, we're not going to buy that. Why? We're not going to accept that representation, and obviously you're just discriminating against transgender persons. But the record here doesn't show that. What the record here shows is an agency that's consistently concerned with cost containment is facing serious choices about cost. What you may be driving at here, and I'm not sure, but we're talking about an equal protection violation as opposed to a due process violation, which would raise the question of whether there's a substantive right to transgender surgery, and as a result, I suppose the opposing side has not placed its eggs in the due process basket because that would lead to a substantive due process right with all those problems. So we're here with an equal protection claim, and I thought that the equal protection violations that the Supreme Court has historically found were violations where a discrete harm and disadvantage could be seen against a suspect class. The Supreme Court's been very careful about the suspect classifications and adding to the list, and normally when an equal protection violation is found, you can identify a discrete harm against racial or ethnic minorities or against men or against women or some suspect harm. Now, of course, there's always a harm any time coverage is denied. That's a harm, but the question of whether it's an equal protection harm depends upon whether you can identify a substantial disadvantage to a suspect class, and what I understood you to say with respect to your arguments about a neutral classification is that you can't identify a disadvantage to men or to women, which are the traditional suspect classes, because the coverage is either extended or denied based on the operation. It's extended whether one is going from male to female or female to male. It doesn't matter, and the suspect classes in the Supreme Court's history are simply not implicated. There's an advantage and a disadvantage, but that's true under every rational basis calculation in equal protection, but this is simply not historically what the Supreme Court has undertaken a step that's this dramatic, and I thought listening to you that that's what you were driving at. I think it is in part, Your Honor. I think there are multiple problems, and that's one of them. There is this disconnect between what we traditionally understand to be protected classes and the actual classes at issue here, which is people who are suffering from gender dysphoria who in turn seek surgical intervention to address that. That's what I'm saying is this is a really dramatic step we are being asked to take, and it is far removed from the traditional Supreme Court analysis. I think that's right, and this in some sense goes back to the colloquy that Judge Rushing was having earlier with counsel where we were trying to kind of put the two boxes in place and say who really are in the two boxes. Even if we kind of open up the scope a little bit here, we're still seeing transgender persons are in the box along with cisgender persons. Let me open up the scope a little bit later. I'm sorry? Judge Chambers ruled against you and the clients of you, the state officials, on the basis of two statutory violations. Yes, Your Honor. The Medicaid Act and the Affordable Care Act and on the equal protection claim. He did, Your Honor. All you're talking about is equal protection. That's correct, Your Honor. So what do you think, it's a package deal? Have you ever heard of the constitutional avoidance doctrine? I have a fondness of action, Your Honor. What's going on here? What happened to the Medicaid Act? In part, Your Honor. What happened to the Affordable Care Act? How did you get past the statutory violations? Judge Chambers ruled against you on those. Certainly, Your Honor, and I want to be clear in my position as amicus as the state of West Virginia. You're just going along with the same message. Right. So you're saying it's not? Not exactly, Your Honor. So part of my reasoning for focusing on equal protection was because as an amicus party, we were principally focused on that. But in no way do we concede that the judge— Well, the amicus are always going to get to the constitutional questions. They don't want to mess with the statutory violations. It's just where the excitement is, Judge King. And you are amicus. That's correct. You really aren't counsel to Mr. Kraft. That's correct. You're the attorney general of the state of West Virginia. That's correct, Your Honor. You didn't appear as his lawyer. I can spare you all the exciting reasons why. Schumann, Fallin, and Pope are their successors. That's correct. So I want to be clear that the only reason why I didn't discuss the statutory claims in my first two minutes there is principally because of my status as amicus. But we are in no way suggesting that Judge Chambers' analysis on the statutory issues was correct. He did actually bind many of those up. And I think you'll likely hear from my co-counsel that— Which he considered a package deal. He did consider it somewhat of a package deal. Well, there's no use saying it's a package deal for us. I think in terms of your analysis of his opinion, it is. Because it all proceeded from the same incorrect assumption that a state isn't entitled to draw distinctions based on diagnosis when those distinctions have extensive overlap or an identity between a protected trait. And I think, as the counsel said earlier, I hate to keep repeating myself here, but the long chain of cases say that identity or that predominance—I mean, a cheap use language like an inevitable predominance— With respect to the protection contention, if the district court ruling was affirmed, it could be affirmed under the Medicaid Act. Your Honor, you're always—  You always have the choice, yes, to instead focus on the statutory case. That's a choice. That we could just willy-nilly ignore the statutory issues and go to the Constitution. Does that give her an advisory opinion? No, Your Honor. I was suggesting Your Honor always has the choice to decide a case on the statutory basis as opposed to a constitutional basis. The state, of course, recognizes that. What the state would suggest, however, is that the district court here viewed all of these various provisions as effectively operating much the same way. Well, of course, in our first case there were no rulings on statutory questions. Correct. It's only in the second case that there were the rulings on the ACA and the Medicaid Act and the rest. But in the first case, we didn't have that problem. And the reason that the opposing counsel said, well, the equal protection claim is squarely presented was because it was the only one that was presented. That's true. That's because they were up here on a statutory appeal of a conjunction. Right. You're up here on a final order appeal. That's correct. Summary judgment. That's correct. 1291 appeal. And then 1292A1 appeal. That's correct, Judge King. And that goes directly to why it actually would be appropriate for the court to address all of these claims together. Because on summary judgment, the district court made a number of factual determinations of seriously disputed questions on a disputed record. And all of those factual determinations effectively drove each and every one of the decisions on each and every one of the claims. When you make decisions about medical consensus, when you make decisions about medical necessity, about what experts said, about what these conditions entailed, all of those were disputed facts. You said there's no material that speaks to facts on the side of the three claims. That's correct, Judge. That's the way Judge Chambers said it. The way that Judge Chambers wrote it is he started by making certain factual findings of facts and then from those factual findings of facts made decisions. He didn't make findings of facts. He accepted the facts in the light most favorable to the non-moving party. Your Honor, I wish I could be that charitable, but unfortunately he characterized them as factual findings. And that's actually part of the reason why— Well, you could argue that he reviewed the facts wrongly, incorrectly, but you want to go directly to the legal protection claim. As I said, Your Honor— And it's fair enough, Your Honor, that we don't want to suggest the statutory claims are less important than the constitutional ones, but ultimately— Well, if they can be dispositive, we're supposed to do it that way. That's absolutely correct. We've got the Chief Justice of the United States, Justice Roberts, saying specifically if we can do it that way, we don't get into the constitution. I'm not here to ask you to overrule Ashlander. I completely agree with that approach. Counsel, how does Ashlander apply? We find ourselves in this weird context. We're reaching the constitutional question in the paired case, and we can't avoid the constitutional question. I guess just as a practical matter, what does it mean to then turn around to the other paired case and say, well, we better not reach the constitutional question? Well, I think as the State, we would say that these issues are too bound up to actually say, yeah, we can avoid the constitutional question, so we'll leave it for another day. We as the State want you to reach all of the issues. Let me be clear. I was only addressing Judge King's concerns. In response to Judge King, why don't you just say nowhere does the ACA or the Medicare Act require this kind of coverage in so many terms, and CMS has approved the West Virginia plan, and there's no requirement in federal law that this kind of thing be covered. I can never say it better than you, Judge Wilkinson, so I won't try to, but I think you're actually getting at exactly the State's point. But now you're trying to, and your time is up. Fair enough. I've blown through my red lights, so I'll just say thank the Court, and we would seek reversal.   Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you, Mr. Wilkinson. Mr. David. Thank you, Your Honor, and may it please the Court, my name is Caleb David. I represent the defendants below appellants who are State officials who oversee the State of West Virginia's Medicaid policy and program, as well as the State agency that administers that program. Instead of going through the same things, I'm going to try and pick out one other aspect of Godaldig that we have not addressed, and then try to argue that Godaldig-Bray, this Court's decision in the Peltier case, and Bostock can all be read consistently in the State of West Virginia's favor. The issue in Godaldig that I wanted to raise for the Court was that the Supreme Court found it incredibly important that there was no risk from which men were protected that women were not. Likewise, there was no risk from which women were protected that men were not. In this case, there is simply no risk that cisgender individuals are protected from that transgender individuals are not protected from. Gender dysphoria, transsexual surgery, surgery to treat gender dysphoria, is not something that is covered for anyone. And the Supreme Court has made it clear that you do not have to make coverage determinations on behalf of a protected class because that's only related to that protected class or only because a protected class would be the only ones who would receive that treatment. Can I give you a hypo that makes me think that's wrong in West Virginia? So imagine someone walks into a doctor's office and says, I have excess breast tissue. I need treatment. You need to know if that person is sex assigned at birth, male or female, to know whether that's covered, right? Potentially covered? No, Your Honor. Why not? Because there has to be a diagnosis. The diagnosis either needs to be for a symptomatic gynecomastia, something that's actually presenting physical pain, or it needs to be for... No, they both say it's presenting physical pain. Well, that would think that outside of the diagnosis of gender dysphoria, Your Honor, and that's why this is such a... Sure, but I guess, again, I'm not getting... The same thing as the previous case. We're going from what a policy says to the way it's implemented. But I'm focusing on what the policy says, and what the policy says is no transsexual surgery. And so a person comes in and says, I have excess breast tissue. I am feeling physical pain as a result. My sense, tell me if I'm wrong, is that a person who's assigned female at birth can potentially get coverage for that, and someone who's assigned male at birth cannot. Again, Your Honor, it depends on the diagnosis. No, no, no. I don't care about the diagnosis. The policy doesn't speak in terms of diagnosis. The policy speaks in terms of transsexual surgery. And it strikes me that if the person who's assigned sex at female wants that procedure to reach that outcome, that person is potentially covered, because I don't see how that's possibly plausibly described as transsexual surgery. And if a person who's male assigned at birth wants that surgery, they're not going to get it, because it's... Because the problem, let's say diagnosis, I'm just going to point out that the diagnosis itself you're going to rely on, rely on the sex assigned at birth, right? Your Honor, because it's a health insurance plan, the diagnosis is critical. You can't receive medical treatment without a diagnosis. Can I ask a follow-up question to that? Is the person that's alleged to discriminate here the doctor, or is it the state? And by that, the question is, yes, the doctor needs to know, right, because that's the doctor patient, but the doctor is not alleged to be discriminating here, right? The question is, is it the state? And the state does not need to know one's sex in order to know that question or not. All they need to know, in fact, all they will know, based on the information coming in, is what is the diagnosis, gender dysphoria, what is the surgery, mastectomy, right, denied. What is the diagnosis, cancer, what is the surgery, mastectomy, granted. Matters not whether that person was transgender or not. Matters not whether that person has any other characteristics. It doesn't matter what their sex was when they were born, right? It just matters, from the state's perspective, did the doctor diagnose gender dysphoria? Either way, man to woman, woman to man, makes no difference, right? So the only person who has to know the sex, and I understand Judge Hyten's question, the only person who has to know the sex is the doctor, but the doctor is not the discriminator, alleged discriminator. That's correct, Your Honor, and the hypothetical that you were bringing up there, I think, is a perfect illustration of the Godovic analysis and how it also fits into the Bostock analysis. It's a perfect illustration of how incredibly clearly tied it is. The state has the purse. Everybody knows that. That's one of the problems in our nation. Whether you get treatment, many times, it's whether or not you can afford it and someone covers it. The state has the purse. Judge Richardson says, well, it's a doctor somewhere making the diagnosis, and then he or she then is the only person behind this curtain who knows what your sex was at birth. No, it's not, because the purse is right here. You won't cover it. If you don't cover it, you're not going to get to that point. I mean, we have to put our hands in the sands like an ostrich. It's no question. You have the purse. Anybody that knows that, you go to a procedure now. Can you please bring your insurance company potentials before you get here so we determine whether or not we're going to do this or not? I mean, it's absurd to say that's disjointed. You said you're not going to cover it. And I think that your colleague said a person presents with a diagnosis for their condition, what do you want to call it, needs surgery for sex change, and they're not covered. And what class of people do you think would be the best target? Transgender people, right? Your Honor, the— What people would present and say I have a condition and the diagnosis from the physician is I need surgery for a physical change of genitalia, but transgender people. That's what a suspect classification is. Who else would present with that other than a transgender person? Your Honor— Could you answer that? Yes, Your Honor. It would only be transgender individuals, and the Supreme Court held in condulting that that's not sufficient to create a facial classification. Of course, there could be a proxy or a margin. No, I don't know what they said. There's very little analysis at all just where pregnancy is not a classification. That's all it said. It doesn't give us anything in terms of analysis and why that is. So now we're going to take a real amorphous footnote and say this covers everything even though clearly it's targeted. And the hate and the incredible backlash in terms of people in terms of against transgender, again, we have put our heads in the sand and said that that doesn't exist. It does exist. And that's what suspect— Just like Loving, in this very building here, before it got to the Supreme Court, that, you know, they always say that, well, you know, not everybody, the black and white can't marry women. White people can't marry black people, so it's okay. Well, that means that if a light-skinned white black person manages to be able to marry a white person, then it doesn't apply to them. It doesn't apply to all black people either. It's absurd. The reality is the courts can't put their head in the sand. This is a backlash in terms that exists in our country, and that clearly only transgender people would be the people, as your colleague so eloquently said, Mr. Williams, that a person presents for a condition, the diagnosis that they need medically necessary, sex change in terms of surgery, genitalia. No. And only transgender would be those persons. How do you get away from that? We concede that only transgender individuals would seek transsexual surgery, as it's termed in the policy, but gender-affirming surgery, as it's now called, or surgery to treat gender dysphoria. We concede that they are the only individuals who would seek that, but that's no different than women being the only ones who would become pregnant, as the Supreme Court said in the Gidalgid case. And the important part of that was that there was no risk from which women were insured, that men were not, and there was no risk from which men were insured, that women were not, and that's the same thing here. And the hypotheticals that have been proposed by both the plaintiffs and the judge. We're talking about the normal pregnancy, right? Correct, with the normal pregnancy. So we don't know what it would be with the complications. I believe that in Gidalgid it did cover for certain complications, but I don't know the exact definitions, but normal pregnancy was the exclusion. And in this instance, if you had a cisgender woman with a diagnosis of breast cancer and a treatment recommendation of mastectomy, that person would receive a mastectomy. If you had a transgender man with a diagnosis of breast cancer and a treatment recommendation for mastectomy, Medicaid would also cover that for that transgender person. It does not matter whether it's a man or a woman, whether they're transgender or cisgender. When you have a change in the analysis is when you go from a cisgender woman with breast cancer with a treatment recommendation for mastectomy and you go to a transgender man with gender dysphoria with a treatment recommendation of mastectomy. There's no coverage for that. The difference was not the change in the person's transgender status or sex. The difference was the change in the person's diagnosis, and that is the difference, and that's what takes this out of the Bostock analysis. That's what makes these individuals who are the plaintiffs in this case not similarly situated for purposes of an equal protection analysis. And because they're not similarly situated, because they have a different diagnosis, this isn't a facial classification. Can I ask you a question? How much of this turns on the fact that this, and you're indulging argument, turns on the fact that this is a health exclusion case? If it were subject only to rational basis, I guess, saying we're not going to hire people with a diagnosis of gender dysphoria and it's totally sex neutral, we won't take men, we won't take women, if you have gender dysphoria, we're not hiring you. It's no more closely linked to transgender status than this exclusion, so would that be okay? Your Honor, I still don't believe that that would be a facial classification, but I think that there would be a much stronger argument for invidious discrimination. And, Your Honor, if that's the case, then that is an issue for the fact finder to determine whether that analysis... Yes, Your Honor. It need not be a rational basis question, right, because that would then raise the question of whether Bostock applies in the equal protection context, and if we believe that Bostock's but-for-cause analysis applies to a non-facial classification, then we would have to run that inquiry, right, the non-hiring through Bostock's analysis. Right, it would be whether or not the decision not to hire someone is the reason for it, it's not that they're not being hired in spite of the fact that they... Right, the point just being that it's not necessarily just rational basis, right? If it's not facial, there's an array of things that you could fall under. Perhaps we could debate about Bostock being one avenue, Arlington Heights being another avenue, Braves facial or Braves proxy being another avenue. There are other avenues, but the question that you're addressing is, it wouldn't be facial. Correct, and whether the Bostock analysis, which would apply in that instance because of the Title VII case, it's possibly different from here, but they all come down to the same guiding principle of, if you can change just the gender or the transgender status of the individual and you arrive at that different conclusion, which we don't have here, then that would be a facial classification, and that's the holding in Gadolzig, and that's what the basic principle of all of these cases that we've looked at, whether it's this court's decision in the Peltier case, whether it's Bray, whether it's Gilbert, whether it's Bostock. Thank you, Mr. David. Thank you. Ms. Borelli, round two. May it please the court, Kara Borelli with Lambda Legal on behalf of the plaintiffs at Belize. Your Honors, we reserve four minutes at the end for my colleague, Ms. Prakash, to deal with class certification issues, but because there's been no discussion of them, unless the court has any questions, we are happy to rest on our brief on those issues, and if the court finds it appropriate to use that four minutes to address any merits issues that the court would like addressed. I want to start just by addressing one dispute that the parties are having, and that's how to characterize what the district court did with respect to factual findings, and I think if you look at the face of the district court, it certainly didn't resolve any disputed facts whatsoever. In fact, if you review that brief section of the opinion, what the court does is review the facts as to which there is no material disputed fact, so there's no error in that part of the opinion. The court is simply reciting the facts to which the parties agree and, therefore, to which the court can rely upon to make the decision. I also want to turn to... I don't want to go through each one, but your colleague says, no, those are not facts with which we agree, and the court styles them as findings of fact. Notwithstanding the title that the court's given to them, if one reads those facts, they can all be found in the record. They can be found in the briefs with sites to places where they haven't been contested and where defendants have conceded them. But if I might, I want to turn next to the issue of the classification here, and I'd like to begin just by quoting the classification in the plan because that is what controls how we determine the classification here. Exclusion in this Medicaid program is for, quote, transsexual surgery and sex change surgery. Those are the two components of the exclusion. On the point about the part about transsexual surgery, the difficulty I'm having with defendants' arguments is that it is impossible for me to see how that is not a facial discrimination classification based on transgender status. You know, this was the same discussion we had in the last argument, and the reason it's not is when you focus on the treatment, then you have to ask, is that a proxy for a classification? And you're arguing it's a proxy for transgender, but the answer that your opponents supply is that not all transgenders suffer from that, and so it doesn't matter whether the person is male, female, cisgender, transgender. They're focused on the treatment, and the question then is, is that a proxy for a class? And it may be or may not be, but I think the Supreme Court said that at least it's not facially discriminatory. I'm not aware of anything in the decisions we've been discussing today that would affect how to read the classification, and frankly, I have a hard time understanding what defendants might think would be an explicit facial classification against transgender people. It would be the classification of persons. In other words, I don't think they've made this clear. There's a distinction about focusing on the treatment and focusing on persons, and you're trying to link the treatment to persons because there's only a narrow group of persons that would be involved, but even in your linkage, it doesn't involve 100% of the persons. It involves those who are treated with dysphoria that need the surgery to remedy dysphoria. That's what is excluded, and so the question is, is that a facial discrimination? And we're right back where we were in the last... I understand your position, but I'm not sure it's as categorically simple as you make it. I understand, Your Honor, and I will do my best not to subject the court to a significant amount of repetition, but I think that the answer... We have an answer before we ever even get to proxy discrimination. It's clearly a proxy for transgender status as well, but I think if you just read the exclusion, it names the group of people, transsexual people, an outmoded term for transgender people. Well, that can't be right, right? Because we know Ms. Payne received surgery, so it can't be that the policy would be read as you read it, no surgery for transsexual people. Instead, it says no coverage for transsexual surgery, which the state is saying is a term of art that refers to a surgery for a particular diagnosis. We know it can't mean no surgery for transsexual people. And I don't mean to suggest that all care of all kinds is denied to transgender people. The claim is that it's for purposes of gender transition. That is the care that is denied. But why I think this exclusion... Tell me why that is. I just think it's what you're trying to otherwise tell us. I agree with you, but help me understand why you read transsexual surgery to be limited to surgery for the care of sexual transition. I'm trying to quote you. But you just said transsexual surgery means surgery for the care of sexual transition. Yes. I don't think there's a dispute about that, Your Honor. I think the defense has conceded that today. They don't disagree that only transgender people have this surgery. I don't think anyone disagrees that it's for purposes of treating gender dysphoria. These things are all integrally and extractively linked. And the reason that this names the group of people and not just a procedure is that transsexual surgery doesn't actually specify any particular procedure, not in any coherent scientific way. There is no unique transsexual surgery. In other words, if a cisgender woman were going to have a hysterectomy, we wouldn't call it cisgender surgery. It's just a hysterectomy. The reason this is phrased the way it is, and I think this has been acknowledged, is that it's an older, quite outmoded phrasing, but it is quite honest about who it singles out for differential treatment, and that is transsexual, or in more modern terms, transgender people. Your Honor, if I may, I would like to turn to the statutory claims and start by talking about the Affordable Care Act claims. So, on the Affordable Care Act, the parties agree that BMS's receipt of federal funding renders it a health program within the meaning of Section 1557. The only issue, then, is whether this is sex discrimination. The answer is yes, for all the reasons provided in Bostock. And for clarity, Gdolgig had zero application to this claim. Regardless of our view on the statutory questions, I understand your position to be that we would still have to rule on the equal protection claim in the first case. Is that correct? Yes, that's correct, Your Honor. The statutory questions don't get us out of anything. Certainly. Wouldn't you expect some kind of... an issue of this degree of controversy and this degree of visibility, wouldn't you expect some... hint or inference from the ACA Act or the ACH Act, ACA, that required coverage in so many terms? And, as I say, isn't some deference owed to CMS, which is the agency charged with implementing this statute and approving state plans for purposes of federal funding, and that the West Virginia plan, with its coverage exclusion, was approved? And don't we owe some respect to the decision of CMS? It's obviously the pertinent agency here. But I don't see where the... where in either federal law or in agency rulings that coverage is required for this sort of treatment or this sort of surgery. It may be a very good idea to cover it, and many states do, and that may be a good idea. But there's a difference between saying, this is permitted because coverage is certainly permitted. I don't think anybody is saying that, no, you can't cover this. But there's a difference, a big difference, between what is permitted, and clearly coverage of transgender surgery is permitted. But there's a difference between saying what is permitted and what is required. And that's the part that I don't get, because I don't see in any federal statute or agency ruling or whatever, that this coverage is required. It's certainly permitted, and it's a perfectly legitimate way for a state to proceed, and maybe 25 states have. But it doesn't answer the question of where in federal law do we draw that this is required, and if it is, shouldn't the statement that it is required be more than an inference? I mean, this is a big issue, and not even defined, I mean, if it's required, why wouldn't federal law come out and say it's required and not leave us to dwell in a land of hints and inferential extrapolations? And I don't see it. It seems states have been told, follow your own preferences, which may diverge quite dramatically. Your Honor, I think one clear place that we have an answer to that question in federal law is the Affordable Care Act. The Affordable Care Act, of course, incorporates the guarantee of protection from sex discrimination from Title IX, and Title IX, as this Court has recognized again recently in Peltier, has long been interpreted in parallel with Title VII, and that is why I think Bostock supplies the answer for the Affordable Care Act claim here. And on this point about Gdoldyg, I just want to make sure I said this clearly. Gdoldyg doesn't have any application to the statutory claim. Congress repudiated both Gdoldyg's outcome and its reasoning when it amended Title VII to recognize pregnancy discrimination as sex discrimination. And so, again, because Title IX and Title VII are interpreted in parallel. So I agree we should generally understand that. We interpret similar language similarly, but Title, like, 1557, the ACA, doesn't have that pregnancy language, and so we don't import new language into the ACA. Well, there's no reason to think that Congress would have saw any need to amend Title IX to correct a faulty decision, because there was no faulty decision to overturn. But 1557 was, right? So 1557, right? I'm not sure I follow why that would be. Let me make sure. It's in Title VII, right? I understand it's in Title VII, but why are we putting it somewhere else? Like, it wasn't there. And if they wanted it to apply when they amended Title VII, they should have amended other places where they wanted it to apply. I don't think there's any reason we would expect them to have to amend other statutes when there was no faulty precedent to overturn. Of course, the decision was, when it was applied to Title VII, it applied only to that statute, and that's why Congress amended it. And in the language of legislative intent, Congress made clear that what it was doing was restoring its original intent to Title VII and it always intended that statute to treat pregnancy discrimination as sex discrimination, and there wouldn't be any daylight between Title IX and Title VII. They would be interpreted in parallel. That's why I told you it would have no application there. And instead, the analysis of Bostock would apply. Your Honor, on the point about Bostock, there's been some discussion that I want to make here about how to understand the causation standard, the but-for-causation-and-multiple-causes language of Bostock. And so if the Court would find that helpful, I'd like to make sure that I address it. It doesn't matter for equal protection or for the Affordable Care Act claims whether other factors besides plaintiff's sex contributed to the decision, including, for example, a diagnosis, particularly where the diagnosis is explicitly sex-based on its face and sex-based by definition. In other words, it doesn't matter if you change more than one variable. And Bostock explains this in detail. So to use an example that Bostock tells us is sex discrimination. Bostock describes the example of an employer who would fire a man who was attracted to other men but would retain a woman who was attracted to men. And the employers in Bostock said, that doesn't work. That's not sex discrimination. Because you haven't just changed sex. You've also automatically changed sexual orientation. That man is gay. That woman is heterosexual. And the employer said, if you want to change only sex, you have to hold sexual orientation constant and compare gay men to lesbian women. But we would fire them both. And so there is no sex discrimination. And Bostock rejects that unequivocally and says that misunderstands the standard of causation under Title VII. Often events have multiple but four causes. Title VII only cares whether sex discrimination was one of them. It doesn't even have to be the primary cause. And that's why that example is sex discrimination, precisely as Bostock instructs. That's not any different under Equal Protection. So the fee decision, for example, confirms that the standard is that the government selects or reaffirms a particular course of action, at least in part, because of its adverse effects on an identifiable group. It only has to be one part of the motivation. And so there is no difference there. And that's why even pointing to a diagnosis, which is also explicitly sex-based, even if it weren't, that wouldn't change the analysis here. We still have sex discrimination and transgender status discrimination. I was asked earlier about the standard of deference under the Medicaid Act, and I do want to make sure that I responded to that as well. Can you help me understand that a little bit? So take Fain as an example, right? Yes. Where there was a diagnosis that justified a hysterectomy, the hysterectomy was provided. Where there was no diagnosis that justified further surgery, it was not provided. That seems to not run afoul of Bostock, right? It's not suggesting. So if we change one thing, right, that is you change from man to woman or woman to man, it doesn't affect the outcome, right? It's the existence of a valid diagnosis. So that example... I understand your argument about the diagnosis itself, right, but bracket that question for a minute. So I think that just points back to the discriminatory line being drawn. It simply restates if you need a hysterectomy for another reason, we will cover it. But if you need a hysterectomy for this reason, for this diagnosis, we won't cover it. That, by the way, concedes the violation to the comparability requirement of the Medicaid Act. But that's the discriminatory line that's being drawn. And it isn't an answer to say, well, the program doesn't discriminate in every conceivable respect. As just one example, if the Medicaid program were to say to one of its female employees, we will not promote you because you're a woman, if she were to bring suit, it wouldn't be a dissent for the program to say, well, we didn't fire you. It isn't an answer that they're not discriminating in every conceivable respect. That doesn't excuse the discriminatory classification at the heart of this case. So on the issue of deference, the district court was correct not to defer to CMS's silence on this issue. Defendants admit that they have received zero communications or analysis from the agency. That's precisely when courts declined to defer. The Ninth Circuit did exactly that in Arizona Alliance for Community Health Centers where the records lacked any evidence of CMS's reasoning. CMS itself explained, as Nick is curious in Davis v. Shaw, that not all state plan approvals necessarily reflect any measured consideration of each of the hundreds, if not thousands, of services that are in those plans. And when this court has afforded deference, it has generally been on a record involving extensive communications from the agency. So West Virginia v. Thompson is an example where the court provided deference to CMS's rejection of a state plan amendment, but only after CMS had requested data from the state of West Virginia, considered a variety of evidence, and conducted administrative review by a CMS hearing officer. We obviously don't have anything of that kind here. Turning back to the comparability requirement. So to the extent that defendant says we're simply treating people differently based on diagnosis, that is what the comparability requirement prohibits. It is straightforward. It doesn't permit discrimination based on diagnosis. And there's no question here that the services themselves are covered. Defendants cover the very same surgical procedures, but they categorically deny them to treat gender dysphoria. That's not disputed. That's in the record of JA304, which lists it. Why would they otherwise be eligible? Under the statute, right, they have to be otherwise eligible in order for this provision to kick in, right? And it seems like to me your diagnosis is what determines whether you're otherwise eligible. What's wrong with that? I want to make sure I'm understanding the court's question. So what this asks is, are there services that are provided to some and not others? And are you making a distinction based on diagnosis? That's the test under the comparability requirement. Defendants admit that here. The services are provided, and we know that because we have a listing of specific surgeries that they cover. But not for the purpose, right? I mean, just because it says, for example, that you can get heart surgery if you have certain characteristics doesn't mean that I can show up and just say, I want heart surgery because I think it would be cool, right? Certainly, Your Honor. So, for example, it would have to be medically necessary. And why is that? Help me understand why that is. That's where I'm going. Because the program only covers medically necessary care. That's all that's at issue here. And that's the only kind of care that plaintiffs seek. No, no, but the statute doesn't say medically necessary. It doesn't limit itself to medically necessary. So my understanding is that if someone were eligible for the service but for the diagnosis that's excluded, and if it is covered for others, then that is a violation of the comparability requirement. So the statute tells us that the plan can't provide medical assistance that's lesser in amount, duration, and scope to one participant as compared to another participant. And the relevant regulation fleshes that out by saying, and that means you can't reduce or deny the amount, duration, or scope of services based on diagnosis. To an otherwise eligible beneficiary. To an otherwise eligible. So someone who can otherwise get the service. So if I'm entitled to a heart transplant, you can't deny it because I also have diabetes. I'm otherwise eligible because I'm entitled to a heart transplant, but you can't deny it because I've got some other diagnosis. Your Honor, if I'm following the court's question, I think that formulation would read out the requirement of prohibiting no discrimination based on diagnosis. And so what the comparability requirement says is if these services are covered, they can't be provided to some. So let me use Davis v. Shaw as an example. Just to add another point there, it's arbitrarily denied, right? It's not a complete, there's a significant level of deference written into the regulation, right? Medicaid may not arbitrarily deny the required service to someone who's otherwise eligible solely because of diagnosis as an illness or condition. Understood, and I think that's precisely what this exclusion does. So, for example, this exclusion isn't aimed at eligibility requirements like medical necessity because the care is categorically denied regardless of medical necessity. That is part of what makes this a violation of the comparability requirement. Your Honor, if the court has no further questions. I have just one further question. That was not the best thing to say. You know, I've listened attentively to your good arguments and I want to say you've done double duty on both of these cases and you've done a very fine job of it. And I've listened and I've heard a lot of words about the 14th Amendment and I haven't heard one single word about the 10th Amendment. And it was almost like, hey, wait a minute, is the 10th Amendment not even part of our Constitution? And, of course, the 10th Amendment reserves certain powers of the state, to the states, the residual powers to the states. And the Supreme Court of five justices in the National League of Cities and four in Garcia said one of those crucial 10th Amendment powers that the states exercise is a certain ability to regulate things with respect to their own employees. And in National League of Cities it was the Fair Labor Standards Act. Here it's an insurance question as opposed to setting wages. Now, it's not the job of an intermediate court to adopt, to say that we follow Garcia because the Supreme Court ruled that way. But if I might just give you a little bit of advice. If this goes up to the Supreme Court. You mean when? I would urge you, I would urge you, we couldn't pose those questions to you because all you would have to do is cite Garcia and we would fall in line. But I would urge you to prepare some answers to questions about the 10th Amendment because that's likely to enter into the conversation up there if it doesn't and couldn't down here. So I'm just trying to say that I think that's going to come up because the state's authority to insure its own employees, not all that different from the Fair Labor Standards Act. And I don't know what they're going to ask you, but I'm just trying to offer a friendly suggestion as to some things you might prepare for, okay? I may help you too. You might remind them that between the 10th and the 14th a war was fought to make sure we had the 14th Amendment. It was a post-Civil War amendment. And I think that changed exactly what states can do in terms of protecting citizens. It was a big change. Thank you both very much. And I hear that there are other questions. I hope not. Okay. Thank you, Ms. Borelli. Thank you very much. Mr. David. Thank you, Your Honor. And I want to start back at the Medicaid Act's comparability requirements that were addressed. And the actual criteria for it is Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service. And this is not a required service. We didn't hear argument on that today. This is not a required service. Gender-affirming surgeries are not required under the Medicaid Act to be covered. CMS has never required it. CMS actually looked at this issue back in 2016 for the Medicare population and declined to issue a national coverage decision on the basis that it was inconclusive of whether these procedures were efficacious for the treatment of gender dysphoria in that population. And so there has not been guidance from CMS informing states that they have to cover this in their Medicaid programs.  That is entitled to deference. And the states are entitled to deference as well and included in these regulations. The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures. Those utilization control procedures that we're talking about are fiscal and actuarial benefits that are so important in the GDALG analysis. And, yes, there is a statement that you cannot change or you cannot reduce the amount of the benefits based on the diagnosis, but that only applies to required services, and this is not one of those. I also wanted to go back to the statement that gender dysphoria is so inextricably intertwined with being transgender, and that's simply not what the record in this case indicates. The testimony from the plaintiff's expert, Dr. Karasik, who's a psychiatrist, he actually testified that when the DSM-IV was in place, and it was changed in 2013, but when the DSM-IV was in place, the disease, gender dysphoria, was called gender identity disorder. And that was because they looked at the identity, being transgender, as being the disorder. That's no longer the case. Being transgender is not a disorder, it's not a psychiatric illness, it's not a mental illness. Gender dysphoria is a psychiatric illness that's included in the DSM-V. The medicine in this has divorced the identity from the disease. We cannot put that back together solely because it could serve as a basis for someone's arguments in a lawsuit. And the medicine in this and the plaintiff's experts don't support that. I want to finally just touch on the ACA and deferences, again, due to the states and CMSs. As we pointed out in our briefs, since 2004, this policy has been put forward in front of CMS and approved annually. And while it has not had the review for this particular provision, the evidence in the record is that CMS has audited or performed audits on our policies. They have pointed out things in the past that are unrelated to this issue, but that they believe ran afoul of the Medicaid Act and weren't in compliance with the regulations. They have never brought this up to anyone at West Virginia Medicaid that this is a violation of the Medicaid Act or the Affordable Care Act. And that silence is entitled to deference, and the state's decisions on what they are going to cover in terms of... What's your best authority for the proposition that we afford deference to a situation where an agency simply hasn't objected to something? Your Honor, it's because this has not been put forth, or it's been put forth in front of CMS. CMS has not noted that there are any issues... Right. I said, what's your best authority for the proposition that under administrative law principles we give deference to that? Your Honor, it would be within the regulations itself. I'm asking, sorry, what statute, constitutional provision, decision of the Supreme Court, or decision of this Court, says we accord deference in that situation? Your Honor, the Medicaid Act itself and its accompanying regulations provide the states with great deference to determine what they are going to cover and what they're not going to cover. And that all should be considered. Now, the last point that I want to make is that this is a big distinguishing fact away from the earlier case that we heard, is that we, West Virginia Medicaid, moved for summary judgment on the issue of equal protection because there is simply no evidence in our record of invidious discrimination. Unlike North Carolina's policy, we cover everything for the treatment of gender dysphoria up to but excluding transsexual surgery as it's stated in the policy. We provide coverage for medical treatments and for psychiatric treatments and for pharmaceutical treatments for gender dysphoria. And the testimony in the record is that that came from a place of caring and compassion. In 2017, West Virginia Medicaid made the decision to cover that care for transgender individuals for the treatment of gender dysphoria. And they did that because individuals were coming to them and explaining that they were distraught, they could not receive their hormones. And West Virginia made the decision that they were going to cover that. Now, that decision did not extend to surgery. And it didn't extend to surgery because West Virginia, in our record, has a $128 million deficit for Medicaid next year. In 2025, it has a $256 million deficit. And that money is already going to result in cuts and reductions in the amount and scope and duration of benefits for other things. And West Virginia is entitled to deference to determine where they're going to take their limited resources and put that money and which services and which diseases that they're going to cover, as long as they are in compliance with the Medicaid Act and covering the things that the Medicaid Act requires them to cover. So if they believe that they need to provide more resources towards heart disease and diabetes and drug addiction and cancer that are all rampant in the West Virginia population, that is their prerogative, and they are entitled to deference for that. For all of those reasons, if there are no further questions, we ask that the Court reverse the District Court's decision in granting summary judgment and grant summary judgment to the State of West Virginia. Thank you, Mr. David. Thank you, everyone. On behalf of the Court, I want to thank counsel for your able arguments. We'll come down and greet and, in two instances, re-greet counsel and then adjourn for the day. Thank you. With that, the Court stands adjourned until tomorrow morning. God save the United States and the Honorable Court. Thank you. Thank you. Thank you. Thank you.
judges: Diaz, Wilkinson, Niemeyer, King, Gregory, Agee, Wynn, Thacker, Harris, Richardson, Quattlebaum, Rushing, Heytens, Benjamin